Tapt, J.,
concurring. In opposing the order of the commission, Ohio Central took the position that it would be required to furnish without charge to subscribers of Northern Ohio the value of all its property devoted to furnishing service to its Wooster exchange subscribers. It is obvious that, by the order here involved, Ohio Central will be required to furnish to the Congress exchange subscribers of Northern Ohio the value of all Ohio Central’s property devoted to furnishing service to its Wooster exchange subscribers. If Ohio Central were required to do this without any compensation either to it or to its subscribers, it is clear that such a requirement would not only constitute a disregard of the statutes of this state but also of Article XIV, Amendments, of the Constitution of the United States, prohibiting the taking of property without due process of law.
It was argued by Northern Ohio that Wooster exchange subscribers of Ohio Central will derive the same advantages from the order in the instant case as those derived by Congress exchange subscribers of Northern Ohio, because each telephone call between the two exchanges will involve a subscriber from each exchange. The fallacy of any such argument can be readily demonstrated by consideration of what makes tele- *185 plume service of any value, as well as a comparison of the elements of value previously and subsequently available to Wooster exchange subscribers of Ohio Central and to Congress exchange subscribers of Northern Ohio.
A telephone service which does not enable a subscriber to contact anyone will obviously have no value. Generally speaking, a telephone service which enables a subscriber to contact 48 other subscribers without any toll charge per call will obviously have much more value than such a service which enables him to contact only one other subscriber. Before the order of the commission in the instant case, a Wooster exchange telephone subscriber of Ohio Central could contact approximately 9,700 other parties without any toll charge. On the other hand, a Congress exchange subscriber of Northern Ohio could contact only about 200 other parties without a toll charge. After the order of the commission in the instant case, a Wooster exchange subscriber of Ohio Central will be able to contact only about 200 more subscribers. He will be to that extent only 200/9,700 times or about 2 per cent better off than he was before. On the other hand by reason of that order of the commission, a Congress exchange subscriber of Northern Ohio will be able to contact approximately 9,700 additional parties. He will be to that extent about 9,700/200 times or 4,850 per cent better off than he was before. Stated another way, after the order of the commission involved in the instant case, each Congress exchange subscriber of Northern Ohio will be able to contact approximately 9,700 additional parties without any toll charge, although each Wooster exchange subscriber of Ohio Central will be able to contact only approximately 200 additional parties without a toll charge. Thus, such a subscriber of Northern Ohio will be afforded an opportunity for about 48Y2 times as many additional contacts as will be such a subscriber of Ohio Central.
Undoubtedly, it was considerations such as this that led the General Assembly to provide in Section 4905.49, Bevised Code, what the commission should do when two telephone companies by either “consolidation, purchase, lease, or contract” undertake to operate “their lines or plants * * * in connection with each other,” as these two telephone companies have been *186 ordered to do in the instant case. That statute specifically provides against such operation “until after the commission has ascertained and determined the valuation * * * upon which the rates, tolls, charges, and rentals are based and has fixed and determined such rates, tolls, charges, and rentals to be so charged.”
Here, as to the subscribers in this extended area (both Central Ohio and Northern Ohio subscribers), not only the property used in furnishing service to Northern Ohio’s Congress exchange but also the property used in furnishing service to Ohio Central’s Wooster exchange represents property, upon the valuation of which rates, tolls and charges in these two exchanges would have to be based if the two companies had agreed upon such extended-area service instead of being ordered to render it.
After the order of the commission in the instant case, a Congress exchange subscriber of Northern Ohio will certainly have the same facilities devoted to his service as will a Wooster exchange subscriber of Ohio Central. In view of the greater distances involved in furnishing such service to such Northern Ohio subscribers, it is conceivable that rates to such Northern Ohio subscribers might be higher than those to such Ohio Central subscribers. Buckeye Lake Chamber of Commerce v. Public Utilities Commission, 161 Ohio St., 306, 119 N. E. (2d), 51. However, for the reasons advanced by this court for that decision, it is inconceivable (in the absence of some other factor such as for example inferiority of Northern Ohio equipment) that rates to such Northern Ohio subscribers could then be lower than those to such Ohio Central subscribers. Certainly, to allow such Northern Ohio subscribers to have the same service as such Ohio Central subscribers at lower rates than charged to those Ohio Central subscribers would amount to the kind of discrimination which the law does not tolerate in the rendering of public utility services. F. & R. Lasarus & Co. v. Public Utilities Commission, 162 Ohio St., 223, 122 N. E. (2d), 783.
Since rates charged to Congress exchange subscribers of Northern Ohio are now substantially less than those charged to Wooster exchange subscribers of Ohio Central, it is not unlikely that, after the order involved in the instant case, either *187 the rates charged to such Northern Ohio subscribers will be too low or those charged to such Ohio Central subscribers will be too high. In determining the reasonableness of rates in the future, it is obvious that the valuation, upon which those rates must be determined, is the valuation of all the property used to furnish the service rendered, i. e., the value of the property of both Northern Ohio and of Ohio Central used in rendering this extended-area service. If the result of such rate fixing is an increase of what are now the lower rates paid by Congress exchange subscribers of Northern Ohio, such increase will probably have to be paid either directly or through Northern Ohio to Ohio Central because such increase will probably be caused not merely by the value of any property of Northern Ohio devoted to rendering this public utility service but by the admittedly much greater value of such property of Ohio Central so devoted. If rates of Wooster exchange subscribers of Ohio Central were not too low before the order involved in the instant case, raising of rates of Congress exchange subscribers of Northern Ohio should enable some lowering of rates of such Ohio Central subscribers.
I concur in the judgment because I believe that nothing in the final order of the commission, or in paragraph three of the syllabus herein, may be considered as deciding or otherwise prejudging the question, whether Congress exchange subscribers of Northern Ohio, either directly or through that company, can be required to pay something to Ohio Central for the increase in the value of telephone service which such Northern Ohio subscribers will receive by reason of the facilities and property of Ohio Central which will be made available to them by the order of the commission in the instant case. I am concurring because of that belief and because Ohio Central has not asked for or been denied compensation from either Northern Ohio or its subscribers for the services which the order of the commission in the instant case will require it to render to Northern Ohio and its subscribers.
Stewabt, .7-, concurs in the foregoing concurring opinion.